CENTRAL TRUST Co. and another *v.* WABASH, ST. L. & P. RY. Co. and others.[1]

WABASH, ST. L. & P. RY. Co. *v.* CENTRAL TRUST Co. and others.[1]

*(Circuit Court, E. D. Missouri.* · April 16, 1885.)

1. RECEIVERS—RAILROADS—MORTGAGOR AND MORTGAGEE—LESSOR AND LESSEE—MANAGEMENT OF NON-PAYING BRANCHES AND LEASED LINES.

The Wabash, etc., Railway Company is composed of a number of consolidated railroad companies, and has in its system a number of leased lines. Before entering the consolidation, the different companies composing it had mortgaged their respective properties to secure issues of bonds. After the consolidation was formed, the consolidated company issued bonds and gave a general mortgage to secure their payment. Subsequently, becoming unable to pay the interest on its bonded indebtedness, it applied for the appointment of receivers for the benefit of all concerned. Receivers were appointed, and ordered to keep the system in the condition of a going concern, but to keep the accounts of the different lines separately. The court authorized them to issue their certificates in order to pay lien claims, and the certificates so authorized were made a first lien upon the entire system. Some of the branches earned more than enough to pay expenses, and the receivers, without the sanction of the court, used this surplus in the payment of lien claims, and general running expenses instead of issuing certificates. Some of the branches belonging to the company and some of the leased lines were found to fall far short of paying running expenses. This state of facts having been brought to the notice of the court by a report of the receivers, and instructions asked for concerning the future management of the system, and it having been suggested that the leases on non-paying lines should be canceled, and all parties in interest having been heard, it was *held:* (1) That where any subdivision earns a surplus over expenses, the rental or subdivisional interest should be paid to the extent, and only to the extent, of that surplus. (2) That where any surplus earned by a subdivision has been diverted by the receivers for general expenses, it should be made good at once. (3) That where a subdivision earns no more than its operating expenses, no rent or subdivisional interest should be paid. (4) That where a lessor or subdivisional mortgagee desires possession or foreclosure, he should have liberty to assert his rights. (5) That the entire system should be kept in the condition of a going concern while it remains in the receivers' hands. (6) That where a subdivision fails to pay operating expenses, they should, if possible, be reduced until they do not exceed its income. (7) That where it is necessary, in order to keep a subdivision in the condition of a going concern, the receivers shall issue certificates which shall be a first lien on the system, for the purpose of raising necessary funds, and all equities respecting such certificates should be adjusted in the final decree.

2. SAME.

After the appointment of receivers in the suit instituted by the Wabash road, the trustees in the general mortgage brought suit to foreclose, and the two cases were consolidated. After the consolidation the complainants in the foreclosure suit moved that the receivers who had been appointed be reappointed as their receivers; but the order asked for contemplated a seizure of part only of the properties then in the receivers' possession. *Held,* that the receivers who had been appointed, acted neither for the mortgagor nor the mortgagee, but for the court, and for that reason, and because the court had taken possession of the system, with the intention of preserving it in its integrity, the motion must be overruled.

Consolidated Cause.   In equity.

[1] Reported by Benj. F. Rex, Esq., of the St. Louis bar.

On the twentieth of March, 1885, the report of Solon Humphreys and Thomas E. Tutt, receivers of the Wabash, St. Louis & Pacific Railway Company, was filed herein. It showed among other things, the earnings and expenses of the leased and branch lines of said road for the period commencing on the twenty-ninth day of May and ending on the thirtieth day of November, 1884, and that some of the branch and leased lines were being operated at a very heavy loss, a loss which in one instance had amounted to $167,000, during the period named. In closing their report the receivers prayed for orders with respect to the future operation of said lines, and concerning the payment of interest, and the respective rentals agreed to be paid by said company in the several leases and agreements set forth in the report, and it was suggested by the attorney for the receivers, when the report was presented, that the best course to pursue under the circumstances would perhaps be to cancel the leases on those lines which were not paying expenses. The court thereupon instructed the receivers to send a copy of their report to each of the lessors and other parties in interest, and notify them that on April 10th following, application would be made by the receivers for some action by the court as to the future retention and operation of the leased lines. On the tenth of April the matter came up for hearing, and after a full discussion the following opinion was delivered, and ordered by the court to be spread upon the records as its order in the premises. The motion concerning the reappointment of receivers, referred to in the opinion, was made in the case of *Central Trust Co.* v. *Wabash, St. L. & P. Ry. Co.;* and asked in substance that the receivership existing in the suit of the Wabash, St. Louis & Pacific Railway Company be extended to that cause, and receivers be appointed under the bill of foreclosure theretofore filed by the said complainants, the Central Trust Company and James Cheney.

The motion of Mr. Hagerman referred to was oral and informal. He said to the court, in the course of the discussion concerning the application of the receivers, that he represented certain bondholders of the Toledo, Peoria & Western Railway Company, one of the branch lines, and that his clients wanted either the interest due them on their bonds or the road, etc. For a history of this case see 22 FED. REP. 272.

*Wells H. Blodgett,* for receivers.

*Wager Swayne, Burnett & Humphreys,* and *H. T. Kent,* for the Wabash.

*Butler, Stillman & Hubbard* and *Philips & Stewart,* for the Central Trust Co.

*James Tausig, Pattison & Crane, J. E. McKeighan, C. B. Adams, Hough, Overall & Judson, John D. Davis, W. H. Bliss, James Hagerman, W. B. Sheldon, Foster & Thompson, McDonald, Butler & Mason, Motter & Judson,* and *D. H. Chamberlain,* for lessors, bondholders, etc.

BREWER, J., (*orally*). Several questions have been presented to us

the last few days, concerning which we have come to a conclusion, and perhaps we had better dispose of those before proceeding with the hearing of other matters.    *    *    *

Now, recurring to the general questions that are presented, we name some half dozen matters, which, we think, should be passed in the form of an order or orders; and let me preface them with a brief statement.

This Wabash road is composed of many subdivisions.   While it is a single corporation to-day, yet into it have passed many corporations, and many separate railroad properties.   In administering such a consolidated property the court must look at, not merely the interest of the mortgagee in this general mortgage, or of the mortgagor as a single entity or corporation, but also the separate and sometimes conflicting interests of the various subdivisions and their respective incumbrances; and, back of all that, the duty which every railroad corporation owes to the public.   For underlying the rule which the supreme court has laid down in respect to the payment, by receivers when they take possession of railroad property, of prior unsecured debts recently accrued, runs the thought, as expressed by the supreme court, that a railroad corporation owes a duty to the public which has given it its franchise and enabled it to construct its road; the duty of operating that road for the benefit of the public.   While that may not be what you may call an absolute duty, enforceable under all circumstances, it is still a duty to be regarded and enforced by the courts when they take possession of railroads through their officers.   And that duty is not limited to the operation of merely that particular fragment of a road which is pecuniarily profitable in its operations, but it extends to the road as an entirety, and to all its branches—all its parts; differing in that particular from the duty which would rest upon the court if it had simply taken possession of property used for private purposes, manufacturing or otherwise, where the single question might well be said to be one of pecuniary profit.   This Wabash road, as a system, was in operation, a going concern, from one end to the other; as such, discharging its duties as best it could to its various creditors.   This court, at the instance of the corporation, and to preserve the integrity of this system, took possession of it by its receivers.   It took possession of it as a going concern, and, so far as is reasonable and practicable, it should continue it as a going concern until it surrenders it to whoever may be the purchasers or future holders of it.

With that preface, and calling these separate branches which have passed into this consolidated road, subdivisions, since some have passed in by way of lease and others by way of consolidation, subject to separate mortgages, we pass orders substantially as follows:

The first is one which has already been entered, and we simply emphasize by repeating it, that subdivisional accounts must be kept separately.   That was an order passed by Brother TREAT at the

very outset of this receivership, in order that the particular equities of each one of these divisions, as between themselves, might be ascertained.

2. Where any subdivision earns a surplus over expenses, the rental or subdivisional interest will be paid to the extent of the surplus, and only to the extent of the surplus. Any past diversion of such surplus for general operating expenses will be made good at once, and, if need be, by the issue of receivers' certificates. Thus, for illustration, this Toledo, Peoria & Western Railroad appears by the report to have been earning a surplus over its operating expenses. That surplus is not the full rental price, yet even that has not been paid to the lessor, having been used for general operating expenses. Any net earnings should be paid over to the lessor, or, if there be a subdivisional mortgage, to the mortgagee, and any such diversion as that should be made good, and good at once. At the inception of this receivership an order was passed authorizing the issue of $2,000,-000 receivers' certificates for the payment of such amount of prior debts for labor and material. Those have been partially paid, and without the issue of all of the certificates authorized, only a half a million having been issued. The receivers, hoping, doubtless, that the business of the road would continue to be such that they need not issue more than half a million receivers' certificates, have diverted funds, which should be applied to the payment of these rents, to the payment partially of this past indebtedness. To that extent the diversion should be restored.

3. Where a subdivision earns no surplus, simply pays operating expenses, no rental or subdivisional interest will be paid. If the lessor or the subdivisional mortgagee desires possession or foreclosure, he may proceed at once to assert his rights. While the court will continue to operate such subdivision until some application be made, yet the right of a lessor or mortgagee whose rent or interest is unpaid to insist upon possession or foreclosure will be promptly recognized. That, it is true, may work a disruption of the system, as evidenced by the movement just made in respect to this Cairo division; but the proceeding for disruption will come from the subdivisions. The court is not sloughing off branches, tearing the system in two; but the disruption, if it comes, will come from those who seek separation, and have a legal right so to do.

4. Where a subdivision not only earns no surplus, but fails to pay operating expenses, as in the St. Joseph & St. Louis branch, the operation of the subdivision will be continued, but the extent of that operation will be reduced with an unsparing though a discriminating hand; that is, if a subdivision does not earn operating expenses, and the receivers are running two trains a day, then lop one of them off. If they are running one train a day, and still it does not pay, then run one train in two days. While the court will endeavor to keep that subdivision in operation, it will make the burden of it to

the consolidated corporation, and to all the other interests put into that consolidated corporation, a minimum. We have used the term, "with an unsparing but a discriminating hand." By this we mean that certain things must be left to the discretion of the receivers. It may be that running one mixed train, proffering slight accommodation to the traveling public, would work a greater deficit than two trains,—one furnishing the conveniences of a passenger train, and the other purely a freight train. That must be left to the discretion of the receivers. The court is not in a position to determine as to what, in any particular case, will be most likely to work out a minimum deficit. If there is any controversy hereafter arising under the management of the receivers respecting any reduction, why all the parties interested can apply to the court. Some of these branches across the river seem, upon the map at least, to be so situated in respect to connections that a limited number of trains would answer all the real demands of the public, and that they would be operated with a very slight expense. Suppose, as of course it may be expected, that there will continue to be a deficiency in the operating expenses of such subdivisions, such deficiency will be paid out of the general earnings of the consolidated road, or, if need be, by the issue of receivers' certificates.

While we are both of us loath to go into the receivers' certificate business, and do as little of it as is reasonably possible for a court having such large properties in its hands, yet in such a case we think the emergency arises. Suppose we take possession of a single short line, (and we have in one or two other cases,) the continuance of that as a going concern is emphasized more than once by the supreme court as a duty, as a reason for paying prior indebtedness, and also as a reason for issuing receivers' certificates. Stop operating it, and it becomes a dead concern; its connections are broken up, and its value is impaired. Therefore, to preserve that value, the courts have said that it is right in a limited degree to issue receivers' certificates, and if that be true where the court has but a single line, it is equally true where it has a road with various branches, and as to all of those branches. The value of any branch abandoned is diminished; and the court may not consider simply the interests of the consolidated company, the mortgagor, and the trust company, the mortgagee. It is bound to regard the interests of each one of these subdivisions that went into the consolidated company, and thus into the receivers' hands; and if the court may and ought to issue receivers' certificates, in order to keep a single line a going concern, so, having possession of this system, with its various branches, for the same reason, and by the same means, it should keep each one of them in operation.

There will be no modification of the order heretofore entered concerning receivers' certificates, but all equities respecting them as between the various subdivisions will be adjusted in the final decree. There may be, as counsel strenuously urged yesterday, a great many

equities as between the various subdivisions in respect to the final burden of these receivers' certificates; but they have been authorized for only such claims as if no receivers' certificates had been issued; and the road, not taken possession of by the court, could have been cast into liens prior to all mortgages upon the road and all its branches; any single labor or material claim could have been cast into a lien which would have been a first lien on the North Missouri road,—a lien antecedent to all its mortgages,—and there is no impropriety in substituting receivers' certificates· for that kind of claim. It simply puts it on the same basis as the claim stood before the certificate was issued. When it comes to a sale of the road or other final disposition of the matter, it may be there will be such equities as will justify the casting of the burden of these certificates upon one subdivision rather than another. If the road goes into a single sale as an entirety, the purchaser has got to take the burden of these receivers' certificates, and before the court passes the road out of its hands the receivers' certificates will be paid.

Application also is made for the reappointment of receivers; or, as stated in the language of the motion, for extending the receivership to the trust company—the mortgagee in the general mortgage. I confess that I do not wholly understand why such an order as that is asked, and I cannot appreciate what counsel mean when they say, "Make the receivers receivers for the trust company,—the mortgagee." As we look upon it the receivers are not receivers for either party. They are simply the hand of the court. In the process of the litigation the court has taken possession of the property, and holds it neither for the mortgagor nor the mortgagee, and it matters not, for the ultimate determination of the suit, at whose instance the receivers were appointed. They act for neither party. They represent neither party. They stand here simply as the hand of the court, holding the property for disposition at the end of the litigation, for the benefit of all. So I cannot see what can be gained as a legal proposition by a new order of appointment extending the receivership, as counsel say, to the trust company, the mortgagee. The receivers will have no greater power,—no different power,—would owe no different duty, and would be no more and no less subject to the orders of this court than they are now, and certainly they would have no right· in the operation of their trust to extend favors to the one side or the other. Furthermore, as receivers appointed at the instance of the mortgagor in the first instance, they took possession of the entire properties while this order, as tendered, contemplates a seizure of part only of these properties, not all. Having taken possession of the road under the idea in the first instance that the integrity of the system had a value and should be preserved, it seems to us the receivership should continue right along in that line. There will be no reappointment of the receivers.

The motion of Mr. Hagerman, representing certain bondholders of

the Toledo, Peoria & Western Railroad Company, must be overruled. We cannot turn the road over to the bondholders or force it upon trustees if they do not come here and ask for it. Partially, of course, the motion accomplishes its purpose, in that the order will pass, as stated above, for paying over the surplus earnings as rent to the corporation.

I believe that minutes all the matters concerning which we have come to a conclusion. My brother TREAT may wish to emphasize some portions of it.

TREAT, J. I think you have covered all the points.